ORDERED.

Dated:  July 28, 2020

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                     Case No. 8:17-bk-08592-MGW
                                                           Chapter 7
Robert Velasco, Jr.,

     Debtor.
_____/

Rosenberg Ventures, Inc.,                                  Adv. No. 8:18-ap-00176-MGW

     Plaintiff,

v.

Robert Velasco, Jr.,

     Defendant.
_____/

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On paper, the facts of this case don't look good for the Debtor. According to

the complaint in this proceeding, the Debtor, who owned International Block

Machine (IBM), promised AJ Construction that IBM could deliver a concrete batch

plant within 45 days. Based on that promise, AJ Construction wired a $117,350

deposit to IBM. Over the next two months, the Debtor withdrew more than $100,000 in cash from IBM's account, ostensibly for raw materials and machine components. But no machine was ever built. Both IBM and the Debtor ultimately ended up in bankruptcy. And the Debtor has since been unable to produce any personal financial records.

On those facts, AJ Construction asks the Court to deny the Debtor his discharge under Bankruptcy Code § 727(a)(3) and (a)(5) because the Debtor has failed to keep his books and records and failed to adequately explain what happened to the $100,000 he withdrew from IBM's account. AJ Construction also asks the Court to determine that the Debtor obtained the $117,350 wire by fraud and that the debt the Debtor owes IBM as a result is therefore nondischargeable under Bankruptcy Code § 523(a)(2).

The facts presented at trial, however, tell a different story. For starters, the promise to deliver a batch plant within 45 days was made by one of IBM's outside sales agents—not the Debtor. The Debtor was unaware of the promise. Even so, the Debtor had every intention of building AJ Construction's batch plant in the normal 45- to 90-day turnaround time. But it appears the Debtor used AJ Construction's deposit to fund another customer's machines. IBM would have then used the payment for those machines to fund AJ Construction's machine. But the other customer never paid. Instead, it sued IBM, shutting the company down and forcing it into bankruptcy. Ever since, the Debtor has been working as a day laborer and living hand-to-mouth on his brother's couch.

Based on those facts, the Court concludes that the Debtor did not have a duty to maintain personal books and records. To the extent he did, the Debtor's failure to keep books and records did not make it impossible to ascertain his financial situation. As for the fraud, there is no basis to hold the Debtor liable for any misrepresentation by IBM's sale agent. Even if there was, a broken promise to perform in the future does not give rise to fraud unless the Debtor, at the time he made the promise, had no intention of performing. And AJ Construction was unable to prove that the Debtor did not intend to perform. The Debtor is therefore entitled to his discharge, and the debt owed to AJ Construction is dischargeable.

## I.    Findings of Fact

### A.    The Debtor forms International Block Machine.

By trade, the Debtor is an electrical engineer, with a background in electronics and automation.[1] In 2008, the Debtor came up with the idea of automating concrete batch plants, which are machines used to mix rock, sand, and cement to make concrete.[2] As a businessman, though, the Debtor wasn't particularly sophisticated. So he partnered with Scott Riner, who was more business savvy, to form International Block Machine.[3]

---

[1] Trial Tr., Adv. Doc. No. 71, at p. 111, ll. 12 – 25.

[2] Trial Tr., Adv. Doc. No. 71, at p. 111, ll. 12 – 25; p. 30, l. 12 – 15.

[3] Trial Tr., Adv. Doc. No. 71, at p. 112, ll. 7 – 23.

### B.    IBM builds custom concrete batch plants.

IBM built everything from automated block machines to automated mobile batch plants of varying sizes.[4] To build a block machine or batch plant, IBM first had to acquire raw materials (such as steel) and other supporting components (pumps, motors, and hydraulic components).[5] Next, the machine components were sub-assembled in Mexico and then shipped by container to IBM's warehouse in Tampa, Florida.[6] Once IBM received the subassemblies, it would begin assembling them and welding the machine together.[7] Over the years, IBM built a couple hundred machines.[8]

### C.    Riner keeps IBM's books and records.

At its peak, IBM employed 30 to 40 people.[9] Most of those people worked at IBM's factory in Mexico or did welding and other assembling at IBM's warehouse in Tampa.[10] The workers who did welding and assembly at IBM's Tampa location were akin to day laborers who would work for IBM for just a couple months before moving on.[11] IBM's core staff consisted of four individuals.

---

[4] Trial Tr., Adv. Doc. No. 71, at p. 111, l. 12 – p. 112, l. 6.

[5] Trial Tr., Adv. Doc. No. 71, at p. 127, l. 6 – p. 128, l. 10; p. 117, l. 11 – p. 120, l. 11.

[6] Trial Tr., Adv. Doc. No. 71, at p. 127, l. 6 – p. 128, l. 10; p. 117, l. 11 – p. 120, l. 11.

[7] Trial Tr., Adv. Doc. No. 71, at p. 127, l. 6 – p. 128, l. 10; p. 117, l. 11 – p. 120, l. 11.

[8] Trial Tr., Adv. Doc. No. 71, at p. 119, ll. 4 – 6.

[9] Trial Tr., Adv. Doc. No. 71, at p. 61, ll. 8 – 11; p. 62, ll. 11 – 21.

[10] Trial Tr., Adv. Doc. No. 71, at p. 62, ll. 11 – 21.

[11] Trial Tr., Adv. Doc. No. 71, at p. 136, ll. 3 – 20.

Although, from time to time, it relied on outsides sales agents such as Ron Harris, IBM had two dedicated inside salespeople who were company employees.[12] The other two individuals were the Debtor and Scott Riner. The Debtor handled the technical side of the business.[13] In addition to handling the programming, Riner did the company's books and records.[14]

Riner kept IBM's books and records, along with the programming, on his personal laptop.[15]

**D.    IBM operates on a cash basis.**

From the start, most of IBM's suppliers insisted that IBM pay in cash for raw materials or components.[16] It was not unusual, for instance, for IBM to buy thousands of dollars of steel in cash on any given day.[17] And IBM had to pay for all the subassemblies done in Mexico with cash.[18] According to the Debtor, IBM couldn't get anything done in the region of Mexico where IBM's factory was located unless it paid cash.[19]

---

[12] Trial Tr., Adv. Doc. No. 71, at p. 125, ll. 7 – 12.

[13] Trial Tr., Adv. Doc. No. 71, at p. 112, ll. 7 – 13.

[14] Trial Tr., Adv. Doc. No. 71, at p. 112, ll. 7 – 23.

[15] Trial Tr., Adv. Doc. No. 71, at p. 112, ll. 24 – p. 113, l. 25.

[16] Trial Tr., Adv. Doc. No. 71, at p. 135, ll. 16 – 20; p. 9, l. 25 – p. 92, l. 5.

[17] Trial Tr., Adv. Doc. No. 71, at p. 9, l. 25 – p. 92, l. 5; p. 93, ll. 13 – 23.

[18] Trial Tr., Adv. Doc. No. 71, at p. 120, l. 15 – p. 121, l. 7; p. 135, l. 16 – p. 136, l. 2.

[19] Trial Tr., Adv. Doc. No. 71, at p. 120, l. 15 – p. 121, l. 7; p. 135, l. 16 – p. 136, l. 2.

### E.    Because of scams by third-parties, IBM has trouble keeping bank accounts.

IBM sold machines around the world to customers in Latin America, Africa, the Middle East, and Eastern Europe.[20] From time to time, individuals working for customers in those countries also worked for other companies that were trying to acquire bank account numbers.[21] According to the Debtor, these individuals would deposit checks into IBM's account so they could acquire IBM's account number and transfer information and then, using that information, write checks out of IBM's account.[22] The Debtor says this happened roughly a half dozen times, forcing IBM to keep moving from one bank to another.[23]

### F.    IBM loses its business records when Riner dies.

In March 2015, Riner was tragically killed in a car accident.[24] After Riner passed away, the Debtor contacted Riner's family several times to try to locate Riner's laptop, which contained IBM's books and records.[25] Riner's family told the Debtor they would look for the laptop, though nothing ever came of it.[26] Unfortunately, the information on Riner's laptop was not backed up anywhere.[27] So, in addition to

---

[20] Trial Tr., Adv. Doc. No. 71, at p. 108, l. 24 – p. 109, l. 4.

[21] Trial Tr., Adv. Doc. No. 71, at p. 108, l. 24 – p. 109, l. 25.

[22] Trial Tr., Adv. Doc. No. 71, at p. 108, l. 24 – p. 109, l. 25.

[23] Trial Tr., Adv. Doc. No. 71, at p. 108, l. 24 – p. 109, l. 25.

[24] Trial Tr., Adv. Doc. No. 71, at p. 69, ll. 17 – 25; p. 113, ll. 5 – 21.

[25] Trial Tr., Adv. Doc. No. 71, at p. 113, l. 24 – p. 114, l. 9.

[26] Trial Tr., Adv. Doc. No. 71, at p. 113, l. 24 – p. 114, l. 9.

[27] Trial Tr., Adv. Doc. No. 71, at p. 113, l. 24 – p. 114, l. 9.

losing its books and records, IBM also lost its programs for cutting certain types of things, which took a while to recreate.[28]

### G.    AJ Construction orders a batch plant.

In August 2015, AJ Construction needed a concrete batch plant.[29] At the time, it was working on a project that required eight acres of concrete.[30] To have control over the quality of the concrete, AJ Construction decided to produce the concrete itself.[31] Brandon Adams, AJ Construction's president, came across IBM when he searched the internet for concrete batch plants.[32]

After discovering IBM on the internet, Adams e-mailed the company through its website and was then contacted by Ron Harris, an outside sales agent who, over the years, sold a half dozen machines for IBM.[33] Adams asked Harris to send him a quote.[34] Eventually, after some back and forth between Adams and Harris, IBM sent AJ Construction an invoice for a concrete batch plant (with certain modifications AJ

---

[28] Trial Tr., Adv. Doc. No. 71, at p. 113, l. 24 – p. 114, l. 9.

[29] Trial Tr., Adv. Doc. No. 71, at p. 30, ll. 5 – 25.

[30] Trial Tr., Adv. Doc. No. 71, at p. 30, ll. 5 – 25.

[31] Trial Tr., Adv. Doc. No. 71, at p. 30, ll. 5 – 25.

[32] Trial Tr., Adv. Doc. No. 71, at p. 30, ll. 5 – 25.

[33] Trial Tr., Adv. Doc. No. 71, at p. 31, ll. 17 – 20.

[34] Trial Tr., Adv. Doc. No. 71, at p. 31, ll. 21 – 23.

Construction proposed).[35] The batch plant's final purchase price was $234,000, with half due up front and the balance due when the machine was delivered.[36]

The invoice gave IBM 45 to 90 days to deliver the concrete batch plant.[37] Upon seeing the proposed delivery time, Adams e-mailed Harris and asked him what the realistic time frame for the machine was, telling Harris that he needed the machine as quick as IBM could deliver it.[38] Harris e-mailed back that IBM was shooting for 45 to 60 days, though he said IBM may need as much as 90 days because of some of the modifications AJ Construction requested.[39]

Adams e-mailed Harris that a 90-day time frame would kill the deal.[40] Adams was expecting the machine to be done within 30 to 45 days—half what IBM was proposing.[41] Harris explained, by e-mail, that he included the additional time to account for emergencies.[42] He then assured Adams that IBM's goal was to deliver the machine in 45 days and that it would be complete within that time frame.[43] When Adams asked for Harris to guarantee the 45-day turnaround time in writing, Harris

---

[35] AJ Construction's Ex. 5, Adv. Doc. No. 63-5; Trial Tr., Adv. Doc. No. 71, at p. 31, l. 24 – p. 32, l. 16.

[36] AJ Construction's Ex. 5, Adv. Doc. No. 63-5; Trial Tr., Adv. Doc. No. 71, at p. 32, l. 25 – p. 33, l. 4.

[37] AJ Construction's Ex. 5, Adv. Doc. No. 63-5.

[38] AJ Construction's Ex. 6, Adv. Doc. No. 63-6; Trial Tr., Adv. Doc. No. 71, at p. 36, ll. 14 – 21.

[39] AJ Construction's Ex. 6, Adv. Doc. No. 63-6.

[40] AJ Construction's Ex. 6, Adv. Doc. No. 63-6.

[41] AJ Construction's Ex. 6, Adv. Doc. No. 63-6.

[42] AJ Construction's Ex. 6, Adv. Doc. No. 63-6.

[43] AJ Construction's Ex. 6, Adv. Doc. No. 63-6.

responded that Adams had his earlier e-mails and that IBM was "ready to get the [machine] completed with[in] the 45 day time period that you have requested."[44]

Harris' e-mail advising Adams that IBM was ready to complete the machine within 45 days was sent at 1:30 p.m. at on August 11, 2015.[45] Less than two hours later, AJ Construction wired $117,350 to IBM.[46]

### H.    IBM fails to deliver the concrete batch plant within 45 days.

Sometime after wiring the $117,350 deposit, Adams looked on the Better Business Bureau website and discovered that IBM had twenty-two reports of machines not being built on time.[47] Concerned about IBM's track record, Adams e-mailed Harris on August 17, 2015 and asked him for pictures and weekly progress reports on the machine.[48] Nearly a month went by with no response.[49] So, on September 14, 2015, Adams e-mailed again,[50] prompting Harris to respond the same day that IBM was in the process of fulfilling AJ Construction's order and promising to send pictures as soon as they were available.[51]

---

[44] AJ Construction's Ex. 6, Adv. Doc. No. 63-6.

[45] AJ Construction's Ex. 6, Adv. Doc. No. 63-6.

[46] AJ Construction's Ex. 7, Adv. Doc. No. 63-7; Trial Tr., Adv. Doc. No. 71, at p. 37, ll. 10 – 20.

[47] Trial Tr., Adv. Doc. No. 71, at p. 39, l. 24 – p. 40, l. 5.

[48] AJ Construction's Ex. 9, Adv. Doc. No. 63-9; Trial Tr., Adv. Doc. No. 71, at p. 39, l. 24 – p. 40, l. 7.

[49] Trial Tr., Adv. Doc. No. 71, at p. 41, l. 23 – p 42, l. 1.

[50] AJ Construction's Ex. 10, Adv. Doc. No. 63-10.

[51] AJ Construction's Ex. 10, Adv. Doc. No. 63-10.

Adams never received the pictures. Frustrated, Adams e-mailed a general e-mail address for IBM, demanding pictures of his concrete batch plant, as well as a list of the equipment that had been finished.[52] On September 23, 2015, Adams received a response—this time from the Debtor.[53]

The Debtor's September 23 e-mail was his first communication with Adams.[54] The Debtor had not been party to the initial discussions between Adams and Harris. And while the Debtor may have seen the initial order, he says he was unaware that Harris had promised a machine within 45 days,[55] which is borne out by the Debtor's e-mail, in which the Debtor tells Adams to "please be aware that your machine in accordance with your purchase order with Ron Harris is not due until sometime between October 8 to December 22, 2015."[56]

Even so, the Debtor goes on to assure Adams that IBM had already acquired many of the components necessary to assemble the machine and that he would have pictures for Adams shortly.[57] He also told Adams that he would speak with him the following day.[58] Adams, however, never received any pictures of his concrete batch

---

[52] AJ Construction's Ex. 11, Adv. Doc. No. 63-11.

[53] AJ Construction's Ex. 12, Adv. Doc. No. 63-12.

[54] Trial Tr., Adv. Doc. No. 71, at p. 55, ll. 2 – 5; p. 56, ll. 7 – 14.

[55] AJ Construction's Ex. 12, Adv. Doc. No. 63-12.

[56] AJ Construction's Ex. 12, Adv. Doc. No. 63-12.

[57] AJ Construction's Ex. 12, Adv. Doc. No. 63-12.

[58] AJ Construction's Ex. 12, Adv. Doc. No. 63-12.

plant (nor, does it appear, was he ever contacted again).[59] When Adams didn't hear back from IBM, he went out and bought another batch plant.[60]

I.    **Between August and September 2015, the Debtor withdraws more than $100,000 from IBM's account.**

The week before AJ Construction wired IBM the $117,350 initial deposit, IBM was basically out of money.[61] In fact, IBM's account was overdrawn the day before AJ Construction's wire came in.[62] In the twenty days after AJ Construction's wire transfer came in, the Debtor withdrew $59,000 in cash from IBM's bank account.[63] The following month, he withdrew another $29,365.22 in cash.[64] By October 13, 2015, just two months after AJ Construction's wire transfer, IBM's account was overdrawn again.[65]

The Debtor says he primarily used the funds to buy raw materials and components from suppliers, who, since IBM's inception, had required the company to pay in cash at the time of delivery.[66] The Debtor, however, also conceded to using

---

[59] Trial Tr., Adv. Doc. No. 71, at p. 46, l. 23 – p. 47, l. 19; p. 48, ll. 3 – 19.

[60] Trial Tr., Adv. Doc. No. 71, at p. 48, l. 20 – p. 49, l. 20.

[61] AJ Construction's Ex. 16, Adv. Doc. No. 63-16.

[62] AJ Construction's Ex. 16, Adv. Doc. No. 63-16.

[63] AJ Construction's Ex. 16, Adv. Doc. No. 63-16.

[64] AJ Construction's Ex. 16, Adv. Doc. No. 63-16.

[65] AJ Construction's Ex. 16, Adv. Doc. No. 63-16.

[66] Trial Tr., Adv. Doc. No. 71, at p. 64, ll. 13 – 18; p. 89, l. 16 – p. 96, l. 2.

some of the money to pay his salary (which appears to have totaled $20,000 for the entire year), as well as $400 for a dinner at Ruth's Chris Steakhouse.[67]

>    **J.    A customer dispute forces the Debtor into bankruptcy.**

In October 2015, just as IBM was running out of money again, the company became embroiled in a dispute with a Venezuelan customer.[68] At the time, the Venezuelan customer had two large machines that were in the process of being completed.[69] All the steel for the machines had been cut and formed, and the frame was being welded together, when the Venezuelan customer demanded that IBM modify the customized (and nearly finished) machines at no charge, otherwise the customer was going to cancel the order.[70]

Of course, IBM didn't have any money to make the changes the customer requested.[71] Ultimately, the Venezuelan customer sued IBM in state court. Although IBM had been pressing ahead despite the difficulties it was encountering, once the Venezuelan customer sued IBM, IBM was forced to file for chapter 7 bankruptcy.[72]

---

[67] Trial Tr., Adv. Doc. No. 71, at p. 97, l. 9 – p. 99, l. 1.

[68] Trial Tr., Adv. Doc. No. 71, at p. 129, l. 14 – p. 131, l. 12.

[69] Trial Tr., Adv. Doc. No. 71, at p. 129, l. 14 – p. 131, l. 12.

[70] Trial Tr., Adv. Doc. No. 71, at p. 129, l. 14 – p. 131, l. 12.

[71] Trial Tr., Adv. Doc. No. 71, at p. 129, l. 14 – p. 131, l. 12.

[72] Trial Tr., Adv. Doc. No. 71, at p. 131, ll. 13 – 18.

### K.   IBM's Chapter 7 Trustee does not take any action to recover the cash withdrawals from the Debtor.

Larry Hyman was appointed as the Chapter 7 Trustee in IBM's bankruptcy case.[73] Hyman, whose background is in accounting, has served as a panel Chapter 7 Trustee for thirty years.[74] As part of his duties in IBM's case, Hyman investigated the company's assets.[75]

In particular, he visited IBM's facility in Tampa, which primarily consisted of a one- to two-acre storage yard.[76] Hyman was unable to access the storage yard.[77] But, through the fence, he saw a machine the size of a box truck, which he later learned belonged to another creditor.[78] He also saw what appeared to be junk (though, in all likelihood, was unpainted machine components).[79] In Hyman's view, the stuff at the storage yard (other than the machine that belonged to someone else) was worthless.[80]

---

[73] Trial Tr., Adv. Doc. No. 71, at p. 76, ll. 1 – 5.

[74] Trial Tr., Adv. Doc. No. 71, at p. 87, ll. 25 – p. 88, l. 3.

[75] Trial Tr., Adv. Doc. No. 71, at p. 82, ll. 8 – 10.

[76] Trial Tr., Adv. Doc. No. 71, at p. 82, l. 8 – 13; p. 83, ll. 12 – 14.

[77] Trial Tr., Adv. Doc. No. 71, at p. 83, l. 15 – p. 84, l. 1.

[78] Trial Tr., Adv. Doc. No. 71, at p. 84, ll. 2 – 22.

[79] Trial Tr., Adv. Doc. No. 71, at p. 84, ll. 6 – 13; p. 132, l. 15 – p. 133, l. 8.

[80] Trial Tr., Adv. Doc. No. 71, at p. 84, l. 6 – p. 85, l. 9.

Hyman also reviewed IBM's bank account statements.[81] At first, he had some difficulty getting them.[82] In fact, he had to continue the 341 meeting four or five times because he didn't have the documents he needed.[83] But eventually he was able to get his hands on the bank statements.

The bank statements that were produced to Hyman showed that the Debtor had withdrawn more than $100,000 in cash from IBM's bank account.[84] The Debtor never provided Hyman any documentation showing how the $100,000 in cash was spent.[85] Even so, Hyman did not take any action against the Debtor to recover any of the cash he had withdrawn from IBM.[86]

Nearly two years after the case was filed, Hyman issued a report of no distribution, and then IBM's bankruptcy case was closed.[87]

### L.    After IBM shuts down, the Debtor lives hand-to-mouth.

Once IBM shut down in 2015, the Debtor was basically out of work. For the next two years, he worked whatever odd jobs he could pick up (some painting here or

---

[81] Trial Tr., Adv. Doc. No. 71, at p. 87, ll. 3 – 8.

[82] Trial Tr., Adv. Doc. No. 71, at p. 76, l. 15 – p. 77, l. 16.

[83] Trial Tr., Adv. Doc. No. 71, at p. 76, ll. 15 – 22.

[84] AJ Construction's Ex. 16, Adv. Doc. No. 63-16; Trial Tr., Adv. Doc. No. 71, at p. 79, l. 7 – p. 80, l. 14; p. 80, l. 16 – p. 81, l. 23.

[85] Trial Tr., Adv. Doc. No. 71, at p. 80, ll. 16 – 18; p. 81, ll. 5 – 12; p. 81, l. 18 – p. 82, l. 1.

[86] Trial Tr., Adv. Doc. No. 71, at p. 87, ll. 3 – 24.

[87] Trial Tr., Adv. Doc. No. 71, at p. 85, ll. 1 – 9.

welding there, or perhaps building a small trailer).[88] Whenever he did manage to pick up work, he would be paid in cash.[89] In 2016, the year after IBM closed down, the Debtor says he had a negative income (he basically lost $16,000).[90] In 2017, he earned $20,000.[91] All the while, the Debtor was living on his brother's couch.[92]

### M.    The Debtor files for bankruptcy.

On November 14, 2016, AJ Construction sued Harris and the Debtor in state court, alleging claims against Harris for fraudulent inducement and negligent misrepresentation and claims against both Harris and the Debtor for common law fraud and conspiracy to defraud.[93] AJ Construction eventually obtained summary judgment against Harris.[94]

But the day before the state court summary judgment hearing, the Debtor filed for chapter 7 bankruptcy.[95] In his schedules, the Debtor listed a 2003 Mercedes worth $2,800; $50 in household goods; and $150 in clothes.[96] As for income, he indicated

---

[88] Trial Tr., Adv. Doc. No. 71, at p. 105, l. 8 – p. 106, l. 13; p. 23, ll. 8 – 21.

[89] Trial Tr., Adv. Doc. No. 71, at p. 105, ll. 19 – 24.

[90] AJ Construction's Ex. 19, Adv. Doc. No. 63-19 at Statement of Financial Affairs; Trial Tr., Adv. Doc. No. 71, at p. 102, l. 4 – p. 103, l. 7.

[91] AJ Construction's Ex. 19, Adv. Doc. No. 63-19 at Statement of Financial Affairs; Trial Tr., Adv. Doc. No. 71, at p. 102, l. 4 – p. 103, l. 7.

[92] Trial Tr., Adv. Doc. No. 71, at p. 137, ll. 11 – 13.

[93] AJ Construction's Ex. 2, Adv. Doc. No. 63-2.

[94] AJ Construction's Ex. 4, Adv. Doc. No. 63-4.

[95] AJ Construction's Ex. 19, Adv. Doc. No. 63-19.

[96] *Id.* at Schedule A/B.

on his Statement of Financial Affairs that he earned $20,000 in 2015, (-$16,000) in 2016, and $9,000 in 2017.[97]

After the Debtor filed for chapter 7 bankruptcy, Carolyn Chaney was appointed as the Chapter 7 Trustee in the Debtor's bankruptcy case.[98] Like Hyman, Chaney, who holds a law degree, is an experienced Chapter 7 Trustee.[99] Early on, the Debtor's lawyer explained to Chaney that several of the documents she requested to conduct the meeting of creditors were not available.[100]

The Debtor says that, because he earned so little income, he hasn't filed a tax return in years.[101] And because of the problems IBM had with its bank accounts, the Debtor says he was unable to maintain a bank account.[102] So the Debtor has no records to show how he made his $1,000 per month or how he spent it.[103] But Chaney conceded that is not unusual for debtors who are basically day laborers.[104]

---

[97] *Id.* at Statement of Financial Affairs.

[98] Trial Tr., Adv. Doc. No. 71, at p. 20, l. 25 – p. 21, l. 5.

[99] Trial Tr., Adv. Doc. No. 71, at p. 19, ll. 10 – 24.

[100] Trial Tr., Adv. Doc. No. 71, at p. 21, ll. 12 – 20.

[101] Trial Tr., Adv. Doc. No. 71, at p. 136, l. 21 – p. 137, l. 4.

[102] Trial Tr., Adv. Doc. No. 71, at p. 108, l. 12 – p. 110, l. 7.

[103] Trial Tr., Adv. Doc. No. 71, at p. 102, l. 17 – p. 103, l. 10; p. 23, ll. 19 – 23.

[104] Trial Tr., Adv. Doc. No. 71, at p. 25, l. 25 – p. 26, l. 17.

## II.     Conclusions of Law

In April 2018, AJ Construction sued the Debtor to object to his discharge and to have the debt owed to AJ Construction determined to be nondischargeable.[105] According to AJ Construction, the Debtor is not entitled to a discharge because he failed to keep books and records and satisfactorily explain the loss of assets, warranting a denial of his discharge under § 727(a)(3) and (a)(5).[106] AJ Construction further contends the debt that the Debtor owes is nondischargeable under § 523(a)(2) because the Debtor obtained the $117,350 wire deposit by fraud.[107] After hearing the evidence at trial, the Court concludes that the Debtor is entitled to his discharge and that the debt he owes AJ Construction is dischargeable.

### A.     AJ Construction failed to meet its burden of proof on its § 727 claims.

Ordinarily, a creditor bears the burden of proving by a preponderance of the evidence that a debtor is not entitled to a discharge.[108] But there is a wrinkle for objections to a debtor's discharge under §§ 727(a)(3) and (a)(5). Under those sections, a debtor can be denied a discharge if he failed to keep or preserve records from

---

[105] Adv. Doc. No. 19.

[106] *Id.* at ¶¶ 60 – 63 & 68 – 70.

[107] *Id.* at ¶¶ 42 – 52.

[108] Fed. R. Bankr. P. 4005 ("At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984) (citing Fed. R. Bankr. P. 4005); *Forbes v. Moore (In re Moore)*, 559 B.R. 243, 253 – 54 (Bankr. M.D. Fla. 2016) ("[A] plaintiff objecting to a debtor's discharge under § 727(a)(4)(A) for an alleged false oath or account must establish by a preponderance of the evidence that the debtor is not entitled to a discharge. The same is true of § 727(a)(5) and § 727(a)(3) claims.") (citations omitted).

which his financial condition can be ascertained (§ 727(a)(3))[109] or if he is unable to satisfactorily explain the loss of assets (§ 727(a)(5)).[110]

For claims brought under §§ 727(a)(3) and (a)(5), the creditor must make a prima facie showing that the debtor has failed to keep or preserve records or has lost assets, at which point the debtor bears the burden of satisfactorily explaining his failure to keep or preserve records or his loss of assets.[111] At all times, though, the objecting party bears the burden of proof.

### 1.    The Debtor adequately explained his failure to keep books and records.

The parties agree on the appropriate standard under § 727(a)(3): Under § 727(a)(3), denial of a discharge is warranted only when (1) the debtor failed to

---

[109] 11 U.S.C. § 727(a)(3) (providing that "[t]he court shall grant the debtor a discharge, unless . . . the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case").

[110] 11 U.S.C. § 727(a)(5) (providing that "[t]he court shall grant the debtor a discharge, unless . . . the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities").

[111] *In re Moore*, 559 B.R. at 254 – 255 (explaining that in a § 727(a)(3) case, "[o]nce the objecting party makes an initial showing that the books and records are inadequate, the burden shifts to the debtors to show that 'such an act or failure was justified under all of the circumstances of the case.'"); *Walton v. Wheaton (In re Wheaton)*, 474 B.R. 287, 291 (Bankr. M.D. Fla. 2012) ("The Trustee must make a prima facie showing the Debtors' records are inadequate. The Debtor may then justify the lack of records.") (citation omitted); *Musselman v. Mullin (In re Mullin)*, 455 B.R. 256 (Bankr. M.D. Fla. 2011) ("A plaintiff, to sustain the initial burden to establish an objection to discharge, must establish 'the debtor formerly owned substantial, identifiable assets that are now unavailable to distribution to creditors.' The burden then shifts to the debtor to satisfactorily explain the loss.") (citation omitted).

maintain and preserve adequate books and records; and (2) the debtor's failure to do so makes it impossible to ascertain the debtor's financial condition.[112]

As a threshold matter, it is necessary to clarify which records we are talking about. At trial, there was testimony about IBM's failure to maintain records, which the Debtor attributes to Riner dying and his laptop (where all IBM's records were kept) going missing. There was also testimony at trial that the Debtor did not keep personal financial records, such as tax returns and bank statements. In its closing argument, AJ Construction concedes that its § 727(a)(3) claim is limited to the Debtor's failure to keep his own personal financial records.[113]

To prove that claim, AJ Construction points to the fact that "[t]hroughout the entirety of his personal bankruptcy, and to this date, Mr. Velasco has not produced a single record of his financial condition."[114] But numerous bankruptcy courts have recognized that "a debtor's failure to keep records is not an absolute bar to a discharge."[115]

---

[112] Adv. Doc. No. 74 at 10 – 11 (arguing that to prevail on a § 727(a)(3) claim, a creditor must prove the debtor failed to keep or present any recorded information and that, as a result, it is impossible to ascertain the debtor's financial condition) (citing *D.A.N. Joint Venture III, L.P. v. Fasolak (In re Fasolak*, 381 B.R. 781, 790 (Bankr. M.D. Fla. 2007)); Adv. Doc. No. 75 at ¶ 41 ("Plaintiff must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.") (citing *Lansdowne v. Cox (In re Cox)*, 41 F.3d 129, 1296 (9th Cir. 1994)).

[113] Adv. Doc. No. 74 at 16 ("This case relates to Mr. Velasco's records, not IBM's records.")

[114] Adv. Doc. No. 74 at 9.

[115] *Maxfield v. Jennings (In re Jennings)*, 349 B.R. 897, 914 (Bankr. M.D. Fla. 2006) (explaining "debtor's failure to keep records is not an absolute bar to a discharge"); *see also Barthlow v. More (In re More)*, 138 B.R. 102, 105 (Bankr. M.D. Fla. 1992) ("Failure to keep records is not an absolute bar to

Instead, to determine whether a debtor's failure to keep records warrants the denial of his discharge, the Court must look at the facts of each case.[116] A number of courts have refused to deny a debtor a discharge under § 727(a)(3) on facts similar to those in this case.[117]

Perhaps the best example is *In re Bryant*.[118] There, the debtor testified that he had not kept any financial records and had not maintained any bank accounts for the two years before the petition date.[119] Although the creditor argued it was unreasonable for the debtor not to have kept any records, Judge Proctor instead concluded that unusual facts of that case did not warrant denying the debtor a discharge. In rejecting the § 727(a)(3) claim, Judge Proctor pointed to the fact that the debtor in that case had been unemployed for two years and, despite being involved in numerous business adventures, appeared financially unsophisticated.[120]

---

discharge, as long as the failure was warranted under the circumstances"); *Turner v Bryant (In re Bryant)*, 1997 WL 375692, at *3 (Bankr. M.D. Fla. Apr. 30, 1997).

[116] *In re Jennings*, 349 B.R. 897, 914 (Bankr. M.D. Fla. 2006); *see also In re Bryant*, 1997 WL 375692, at *3 (Bankr. M.D. Fla. Apr. 30, 1997) (observing that "[t]he Court has also held that failure to keep records must be determined on a case by case basis, and that a debtor's failure to keep records is not an absolute bar to a discharge").

[117] *See, e.g., In re Bryant*, 1997 WL 375692, at *3 (Bankr. M.D. Fla. Apr. 30, 1997) (rejecting § 727(a)(3) claim where debtor was unemployed for two years prepetition and appeared financially unsophisticated); *In re More*, 138 B.R. 102, 105 – 106 (Bankr. M.D. Fla. 1992) (rejecting a § 727(a)(3) claim where the debtor was a senior clerk at a local community college and, as such, was not engaged in an occupation that would require keeping financial records).

[118] 1997 WL 375692 (Bankr. M.D. Fla. Apr. 30, 1997).

[119] *Id.* at *3.

[120] *Id.* at *3.

Like the debtor in *Bryant*, the Debtor here failed to keep any financial records or maintain any bank accounts for the two years before the petition date. While he was not unemployed, like the debtor in *Bryant*, the Debtor here was basically a day laborer, picking up odd jobs here and there for cash. And like the debtor in *Bryant*, the Debtor was unsophisticated even though he was involved in a business.

AJ Construction tries to make much of that last point, attempting to portray the Debtor as a sophisticated businessman who ran an international business for nearly a decade.[121] While it's true that the Debtor is an engineer by trade and owned a company that sold machines overseas, the evidence at trial showed he was not a sophisticated businessman at all.

In fact, one of the reasons the Debtor partnered with Riner was because Riner was more business savvy than the Debtor was. That was also the reason that Riner—not the Debtor—was charged with the responsibility of keeping IBM's books and records. Because the Debtor did not keep IBM's books and records, and because there was no evidence he ran the financial side of the company, the Court declines to attribute to him any financial acumen.

In any event, regardless of his engineering background and the role he played at IBM, for the two years preceding this bankruptcy case, the Debtor was a day laborer living hand-to-mouth on his brother's couch. Although this chapter 7 case was brought about as a result of the Debtor's involvement in IBM's business dealings,

---

[121] Adv. Doc. No. 74 at 14 – 15.

this case is more akin to those where courts did not expect debtors to keep financial records.[122]

After all, what kinds of books and records would the Debtor keep? For the last two years, his sole source of income has been from odd jobs he picks up here and there. And he was paid cash for those jobs—$9,000 in all over the past two years. Even the Chapter 7 Trustee concedes the typical person in these circumstances would not have proof of their income.

About the only records the Court (and the Chapter 7 Trustee) would expect are bank statements. But, at trial, the Debtor explained that he was unable to maintain a bank account because of the problems IBM had with its bank accounts. The Court finds that testimony, which went unrebutted at trial, credible. So the Court concludes that the Debtor in this case had no duty to keep books and records, and to the extent he did, he satisfactorily explained why he didn't keep any records.

But even if the Debtor should have kept bank statements, his failure to do so didn't make it impossible to ascertain his financial condition. The Debtor contends that for the last two years, he has basically been living as a day laborer; he works odd

---

[122] *See, e.g., In re More*, 138 B.R. 102, 105 – 106 (Bankr. M.D. Fla. 1992) (rejecting a § 727(a)(3) claim where the debtor was a senior clerk at a local community college and, as such, was not engaged in an occupation that would require keeping financial records); *In re Jennings*, 349 B.R. 897, 914 (Bankr. M.D. Fla. 2006) ("To the extent that the absence of the receipts for cash expenditures renders Defendant's records inadequate, the Court finds that Defendant justified such inadequacy. The Court finds credible Defendant's explanation that it was his longtime practice not to maintain receipts for cash expenditures for personal expenses such as dating, hotel rooms, restaurants, airplane fuel, yacht fuel and maintenance, expenses related to his other boats and collector cars, clothing and groceries because there was no benefit in doing so. The Court will not deny Defendant's discharge pursuant to § 727(a)(3).").

jobs here or there for cash; he drives his brother's car; and he lives on his brother's couch.

To investigate the Debtor's finances, the Chapter 7 Trustee sent an appraiser out to meet with the Debtor. The appraiser confirmed that the Debtor's assets consisted of an older-model (2003) Mercedes and very little personal property, which matched what the Debtor listed on his schedules. The Trustee testified that she saw no need to do any further investigation, though, in fairness, that was (in part) because AJ Construction was involved in the case. Although AJ Construction called the Trustee as a witness at trial, it did not elicit from her any testimony that it was impossible for her to ascertain the Debtor's financial condition.

None of this is to say that a debtor doesn't have to keep books and records. This Court's ruling should not be read to extend beyond the facts of this case. Based on the somewhat unique facts of this case, the Court concludes that the Debtor has satisfactorily explained why he has no financial records. AJ Construction therefore failed to meet its burden of proof on its § 727(a)(3) claim.

## 2. The Debtor adequately explained the loss of assets.

Under § 727(a)(5), a debtor may be denied a discharge if he fails to satisfactorily explain the loss of any assets.[123] Here, AJ Construction alleges that the

---

[123] 11 U.S.C. § 727(a)(5) (providing that "[t]he court shall grant the debtor a discharge, unless . . . the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities").

Debtor has failed to account for the $100,000 that he withdrew from IBM after AJ Construction wired the $117,350.

Even if the Debtor could not explain the loss of the $100,000, AJ Construction still would not be entitled to prevail on its § 727(a)(5) claim: § 727(a)(5) speaks to the Debtor's failure to explain the loss of his own—not someone else's—assets.[124] The $100,000 was IBM's—not the Debtor's—asset. Thus, this Court cannot deny the Debtor his discharge because he cannot explain the loss of IBM's assets.[125]

Putting that aside, the Court is convinced that the Debtor did satisfactorily explain what happened to the $100,000. Some portion of it went to pay his salary, which was $20,000 in income for all of 2015. And roughly a thousand dollars went towards a nice steak dinner and something from a T-Mobile store. But, based on the Debtor's testimony at trial, the bulk of the money went to buy raw materials and machine components.

AJ Construction is understandably skeptical of the Debtor's explanation. How can the Debtor claim he used the bulk of the $100,000 for raw materials and machine components when no machine was ever built? That is the unstated theory of AJ

---

[124] *Fiandola v. Moore (In re Moore)*, 619 F. App'x 951, 954 (11th Circ. 2015) ("We conclude from the record that the bankruptcy court correctly decided that the Moores should not be denied a discharge of debts under 11 U.S.C. § 727(a)(5) because they were under no obligation to explain the loss of corporate owned assets in a single-member limited liability corporation."). *Forbes v. Moore (In re Moore)*, 559 B.R. 243, 257 (Bankr. M.D. Fla. 2016) (explaining that "§ 727(a)(5) concerns only assets belonging to the debtor" and ruling that "[s]ection 727(a)(5) does not require Mrs. Moore to explain the deficiency of Moore Pizazz's assets because the asserts were owned by the corporation, not Mrs. Moore").

[125] *In re Moore*, 619 F. App'x at 954; *In re Moore*, 559 B.R. at 257.

Construction's case: the Debtor must have taken the money for his own use since IBM never built AJ Construction's machine.

But that assumes that when a deposit came in on a machine, the funds were earmarked in an account to be used only for that customer's machine. Based on the testimony at trial, the Court can infer that's not what was going on in this case. It's obvious to the Court, again based on the testimony at trial, that this was a classic "robbing Peter to pay Paul" scenario.

At the time AJ Construction wired its deposit, IBM was having some financial difficulty. Although we don't know the precise timing, we know that, around the time AJ Construction wired IBM the $117,350, IBM was trying to complete two machines for a Venezuelan customer. The Court is convinced that IBM used the bulk of AJ Construction's $117,350 deposit for machine components—but just for the Venezuelan customer's machines.[126]

If it used up all of AJ Construction's money building another customer's machines, how was IBM going to build AJ Construction's batch plant? Easy. Once IBM delivered the two machines to the Venezuelan customer, it would be paid, and then it could use that money to complete AJ Construction's machine. Except there was one problem: the Venezuelan customer demanded last-minute change orders at no charge, and when IBM didn't (really couldn't) accommodate those change orders,

---

[126] The Debtor also claims that IBM acquired the raw materials and components for AJ Construction's batch plant and that subassemblies were being put together. Trial Tr., Adv. Doc. No. 71, at p.131, ll. 19 – 23.

the Venezuelan customer refused to pay. When the Venezuelan customer refused to

pay, IBM had no money to build AJ Construction's batch plant.

This "robbing Peter to pay Paul" business model is hardly unusual with small

companies that depend on a steady cash flow: new jobs pay for the completion of

existing jobs.[127] Keep in mind, the Court is not blessing use of a "robbing Peter to

pay Paul" business model.

But "robbing Peter to pay Paul," by itself, is not necessarily fraudulent.[128]

Besides, creditors concerned that their deposit may be used to fund another

customer's job have a way of protecting themselves: have the deposit put into an

express trust that limits the debtor's ability to use the deposit. If the debtor then

misuses the trust funds, the debt would then be nondischargeable under Bankruptcy

Code § 523(a)(4).[129]

Here, there is no express trust, and, in any event, we are not talking about a §

523(a)(4) claim. We are talking about what happened to AJ Construction's $117,350

---

[127] *See, e.g., Fidelity & Deposit Co. of Md. v. McIntosh (In re McIntosh)*, 320 B.R. 22, 29 (Bankr. M.D. Fla. 2005) ("This Court often encounters construction companies in bankruptcy because construction is an inherently high-risk business. The Court has seen many cases of 'robbing Peter to pay Paul.'").

[128] *Mack v. Mills (In re Mills)*, 345 B.R. 598, 606 (Bankr. N.D. Ohio 2006) ("In the words of Plaintiffs' counsel: Mr. Mills was 'robbing Peter to pay Paul.' While not denying this practice, Mr. Mills responded that this was done out of necessity because at the time his business was facing financial hardships. It is not an uncommon occurrence for many businesses, as they begin their slide into insolvency, to use funds received from one project to pay for another. Obviously, such a practice cannot be condoned. Yet, alone, such a practice does not establish that a debtor acted with the intent to defraud.") (citing *Thompson v. Brookshire (In re Brookshire)*, 17 B.R. 308, 311 (Bankr. N.D. Ga. 1982).

[129] 11 U.S.C. § 523(a)(4) (providing that a chapter 7 discharge does not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny").

deposit. The evidence at trial establishes that the Debtor did use the deposit for raw materials and components. To be sure, although some may have been used for AJ Construction's batch plant, the bulk of the deposit was most likely used to complete the Venezuelan customer's machine, at which point the money from that job would have been used for AJ Construction's job. Unfortunately, that did not pan out.

But, absent an express trust, the Court concludes the Debtor satisfactorily explained what happened to AJ Construction's deposit. Thus, AJ Construction failed to meet its burden of proof on its § 727(a)(5) claim.

### B. AJ Construction failed to carry its burden of proving that the Debtor obtained the $117,350 wire deposit by fraud.

To prevail on its § 523(a)(2) claim, AJ Construction concedes it must prove that (1) the Debtor made a false representation; (2) AJ Construction relied on the false representation; (3) AJ Construction's reliance was justifiable; and (4) AJ Construction suffered a loss a result of its reliance on the false representation.[130] In its closing argument, AJ Construction contends that the evidence at trial showed that it relied on the *Debtor's* misrepresentation that it could deliver the concrete batch plant in wiring the initial $117,350 deposit to IBM.[131]

---

[130] *Stewart Title Guar. Co. v. Roberts-Dude (In re Roberts-Dude)*, 597 F. App'x 615, 617 (11th Cir. 2015) ("[T]he elements of a claim under § 523(a)(2)(A) are: (1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the false representation.") (citations omitted).

[131] Adv. Doc. No. 74 at 17 ("The evidence presented at trial shows Mr. Velasco fraudulently misrepresented to AJ Construction that IBM could complete the batch plant within 45 days. Even more, Mr. Velasco fraudulently misrepresented that IBM could complete the batch plant in the first place.").

In actuality, the evidence at trial established that it was Ron Harris—not the Debtor—who represented that IBM could deliver the concrete batch plant within 45 days. In fact, the evidence at trial was undisputed that the Debtor only had one communication with AJ Construction—and that was more than 30 days after AJ Construction wired the $117,350 to IBM.

In its closing argument, AJ Construction appears to recognize this problem with its § 523(a)(2) claim. So it offers up a theory for getting around it: the Debtor knew his company was on the verge of bankruptcy, so "he had Harris make a promise they could not keep."[132] According to AJ Construction, the Debtor "had Harris sell the impossible."[133] In other words, the Debtor forced Harris to promise that IBM could deliver the machine within 45 days.

There's one problem with this theory: the evidence at trial showed that the Debtor was unaware Harris had promised delivery within 45 days. For one thing, the Debtor testified that Harris never told him about the 45-day delivery. That testimony went unrebutted at trial. More important, it was corroborated by a September 23 e-mail the Debtor sent to AJ Construction.

Recall that Adams e-mailed a general e-mail address for IBM on September 18, 2015, demanding pictures of his concrete batch machine, as well as a list of the equipment that had been finished. Five days later, the Debtor responded, basically

---

[132] Adv. Doc. No. 74 at 18 ("At this point Mr. Velasco knew the only way he could get any money into the company is if he had Harris make a promise they could not keep.").

[133] Adv. Doc. No. 74 at 18 ("Nonetheless, Mr. Velasco had Harris sell the impossible.").

telling Adams to "hold his horses" because IBM still had another 45 days to

complete the batch plant:

> [W]e are putting together your machine, please be aware
> that your machine in accordance with your purchase order
> with Ron Harris is not due until sometime between
> October 8 to December 22, 2015. As of today, only 30
> days have past (sic).[134]

Based on the Debtor's September 23 e-mail, there's no question in the Court's

mind that the Debtor was not aware that Harris had promised that IBM would

deliver the batch plant within 45 days. There certainly was no evidence at trial that

the Debtor directed Harris to make any such promise.

Absent a misrepresentation by the Debtor, AJ Construction is left trying to

impute the fraud of a wrongdoer (Harris) against an innocent person (the Debtor). It

is true that, 135 years ago, the Supreme Court in *Strang v. Bradner* held that the fraud

of a wrongdoing partner could be imputed to an innocent partner in bankruptcy for §

523(a)(2) purposes.[135]

---

[134] AJ Construction's Ex. 12, Adv. Doc. No. 63-12.

[135] *Strang v. Bradner*, 114 U.S. 555, 560–61 (1885) ("The only other question to be determined is whether the defendants John B. Holland and Joseph Holland can be held liable for the false and fraudulent representations of their partner, it being conceded that they were not made by their direction nor with their knowledge. Whether this action be regarded as one to recover damages for the deceit practiced upon the plaintiffs, or as one to recover the amount of a debt created by fraud upon the part of Strang, we are of [the] opinion that his fraud is to be imputed, for the purposes of the action, to all the members of his firm.").

Since then, numerous courts have followed *Strang*.[136] But those courts have

only applied *Strang* in the partnership or agency context.[137] That's because *Strang* was

decided based on partnership (or agency) law.[138] And under partnership law, innocent

partners are jointly and several liable for the acts of a wrongdoing party.[139] The same

is true under agency law.[140] Because *Strang* was premised on partnership or agency

law, the Eleventh Circuit, in *In re Villa*, refused to extend *Strang* beyond the

partnership or agency context.[141]

Here, the Debtor and Harris are not partners—nor is Harris the *Debtor's* agent.

He may be IBM's agent. But seven years ago, in *In re Nascarella*, this Court, based on

the Eleventh Circuit's *In re Villa* decision, ruled that a bankruptcy court may not

---

[136] *Belmont Wine Exchange v. Nascarella (In re Nascarella)*, 492 B.R. 327, 335 (Bankr. M.D. Fla. 2013) (citing *BancBoston Mtg. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556–62 (6th Cir.1992); *Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini)*, 780 F.2d 1440, 1443 (9th Cir.1986); *Moore v. Gill (In re Gill)*, 181 B.R. 666, 673–74 (Bankr. N.D. Ga.1995); *Terminal Builder Mart of Piedmont, Inc. v. Warren (In re Warren)*, 7 B.R. 571, 573 (Bankr. N.D. Ala.1980)).

[137] *In re Nascarella*, 492 B.R. at 335.

[138] *Strang*, 114 U.S. at 561 ("Each partner was the agent and representative of the firm with reference to all business within the scope of the partnership. And if, in the conduct of partnership business, and with reference thereto, one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, and without notice of any limitations upon his general authority, his partners cannot escape pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge "); *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148, 1152 (11th Cir. 2001) ("Strang imputed liability for fraud in bankruptcy based on the common law of partnership and agency.").

[139] *In re Nascarella*, 492 B.R. at 337 – 38.

[140] *Id.*

[141] *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148, 1152 – 53 (11th Cir. 2001) ("[W]e are bound to a narrow reading of Strang. Strang imputed liability for fraud in bankruptcy based on the common law of partnership and agency. In the instant case, there is no suggestion that [the debtor] and [the brokerage firm] were partners, so partnership law, as applied in Strang, is inapplicable in this case.").

impute the wrongdoing of a corporate agent to a sole member of a limited liability company or corporation.[142] So to the extent Harris misrepresented that IBM could deliver the batch plant within 45 days, that misrepresentation may not be imputed to the Debtor.

But even if it could, AJ Construction still would not be entitled to prevail on its § 523(a)(2) claim. Here, the representation giving rise to AJ Construction's § 523(a)(2) claim is Harris' promise that IBM would deliver a batch plant within 45 days. Ordinarily, a broken promise to perform in the future does not give rise to a § 523(a)(2) claim.[143] A § 523(a)(2) claim based on a promise of future performance arises only when a creditor can prove that the debtor did not intend to perform at the time he made the promise.[144]

At trial, AJ Construction failed to prove that the Debtor did not intend to perform. At best, AJ Construction made out a circumstantial—though weak—case that the Debtor had not intended to build the batch plant. The circumstantial evidence could be summed up as follows: shortly before AJ Construction wired the $117,350 to IBM, IBM was in financial trouble (in fact, it was overdrawn on its

---

[142] *In re Nascarella*, 492 B.R. 327, 338 – 39 (Bankr. M.D. Fla. 2013)

[143] *Bernacchi v. Cascio (In re Cascio)*, 568 B.R. 851, 858 (Bankr. M.D. Fla. 2017) ("[S]tatements of intent to perform an act in the future generally do not form the basis of a false representation under § 523(a)(2)(A).").

[144] *Cary v. Vega (In re Vega)*, 503 B.R. 144, 148 (Bankr. M.D. Fla. 2013) ("Statements of intent to perform certain acts in the future 'will not generally form the basis of a false misrepresentation that is actionable under Section 523(a)(2)(A) unless the creditor can establish that the debtor lacked the subjective intent to perform the act at the time the statement was made.'") (quoting *In re Bucciarelli*, 429 B.R. 372, 375 (Bankr. N.D. Ga. 2010)).

account); Harris' promise to deliver the batch plant within 45 days induced AJ Construction to wire IBM $117,350; in the two to three months following AJ Construction's wire, the Debtor withdrew $100,000 in cash from IBM's account; there are no records showing what the $100,000 was spent on, though the Debtor concedes he used some to pay his salary; and IBM never made any substantial progress building AJ Construction's batch plant.

While that evidence, in isolation, could support a finding that the Debtor never intended to build AJ Construction's batch plant, it is equally consistent (if not more so) with a phenomenon this Court often refers to as "terminal euphoria"—a condition that many debtors (who are engaged in business) suffer from. Debtors, no matter how dire their financial straits, always believe better days are ahead: if they can just land one more job, things will turn around.

After hearing the evidence at trial, the Court concludes that the Debtor was suffering from terminal euphoria. Over the years, IBM had been relatively successful, building a couple hundred machines. Over the course of 2015, though, the business started taking on water.

First, Scott Riner dies in March. When he does, not only does IBM lose its books and records, it also loses its programs for cutting things. The company has to scramble to recreate the programming, which took a while. Then IBM becomes mired in the dispute with the Venezuelan customer that ultimately forced IBM into bankruptcy.

Despite all that, the Debtor testified that he had every intention of building AJ Construction's machine. And the Court believes him. In this Court's experience, the Debtor's testimony is entirely consistent with debtors who believe better days are ahead, even though, in reality, bankruptcy is looming around the corner. "Terminal euphoria," though irrational, does not give rise to fraudulent intent not to perform in the future. AJ Construction therefore failed to meet its burden of proof on its § 523(a)(2) claim.[145]

## III.   Conclusion

Bankruptcy Code §§ 727(a)(3) and (a)(5) penalize a debtor (by denying a discharge) for perpetrating a fraud on the bankruptcy process. Bankruptcy Code § 523(a)(2) penalizes a debtor (by rendering a debt nondischargeable) for perpetrating a fraud on a particular creditor. AJ Construction failed to prove that the Debtor perpetrated a fraud on the bankruptcy process or AJ Construction.

The Debtor is therefore entitled to his discharge and to have any debt he owes AJ Construction discharged in this bankruptcy case. The Court will enter a final judgment in the Debtor's favor on AJ Construction's claim in this proceeding.

---

[145] *Lopez v. Hernandez (In re Hernandez)*, 565 B.R. 367, 376 (Bankr. W.D. Tex. 2017) ("The Court finds that Jorge did not intend to deceive Magdalena when he solicited her investment. He was quite sanguine about the prospects for the business, and Magdalena shared his 'terminal euphoria.' Without showing an intent to deceive, Magdalena cannot prevail under the "actual fraud" prong of §§ 523(a)(2)(A) or 523(a)(2)(B).").

Attorney Stanley J. Galewski is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who do not receive service by CM/ECF and to file a proof of service within three days of entry of these Findings of Fact and Conclusions of Law.

**Stanley J. Galewski, Esq.**
**Galewski Law Group, P.A.**
  *Counsel for the Debtor*

**Garrison M. Cohen, Esq.**
**Colby S. Hearn, Esq.**
**Johnson, Pope, Bokor, Ruppel & Burns, LLP**
  *Counsel for Rosenburg Ventures, Inc., d/b/a AJ Construction*